**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| SAMUEL MCCAIN, § | |
| § | |
| Plaintiff. § | |
| § | |
| V. § | CIVIL ACTION NO. 4:21-cv-02071 |
| § | |
| GR WIRELINE, L.P., *et al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Samuel McCain ("McCain") has filed a Motion to Authorize Notice to Potential Plaintiffs Pursuant to § 216(b) or, in the Alternative, for Expedited Discovery to Facilitate Notice to Potential Plaintiffs ("Motion to Authorize Notice"). *See* Dkt. 21. For the reasons that follow, I recommend that the Motion to Authorize Notice be **DENIED**.

## BACKGROUND

This is a collective action for unpaid wages under the Fair Labor Standards Act ("FLSA"). Defendants GR Wireline, L.P. and GR Energy Services Operating GP LLC (collectively, "Defendants") provide oil and gas services in various states, including Texas, Oklahoma, and North Dakota. McCain worked for Defendants on two separate occasions. From February 2018 through April 2020, McCain worked as a Field Supervisor for Defendants. During his time as a Field Supervisor, McCain received a salary and Defendants classified him as exempt from the FLSA's overtime requirements. McCain left in April 2020 to work for another company but returned to Defendants in October 2020 to work as an Operator. In this role, McCain was paid an hourly wage and received overtime compensation.

In June 2021, McCain filed suit against Defendants on behalf of himself and all former and current employees of Defendants who worked as Field Supervisors or Operators. McCain alleges that he and his co-workers were not paid overtime as

required by the FLSA. For the Field Supervisor and Operator positions, McCain advances distinct arguments for why he believes he and his co-workers are entitled to additional compensation. As a Field Supervisor, McCain claims that Defendants misclassified him and others as exempt from the requirements of the FLSA. Because he and others typically worked in excess of 40 hours per week as Field Supervisors, McCain maintains that Defendants are responsible for paying Field Supervisors overtime compensation. As an Operator, McCain asserts that Defendants failed to compensate him and his co-workers for various off-the-clock time to which they are due.

Presently before me is McCain's request that this case proceed as a collective action with notice issued to potential collective action members.

### THE LEGAL FRAMEWORK FOR FLSA COLLECTIVE ACTIONS

The FLSA requires employers to pay certain employees one and one-half times the employee's regular rate of pay for hours worked in excess of 40 hours per week. *See* 29 U.S.C § 207(a)(1). The FLSA further authorizes an employee to bring a collective action on behalf of himself and other "similarly situated" employees:

> An action to recover the liability [for violations of the FLSA] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and [o]n behalf of himself or themselves and other employees similarly situated.

*Id.* § 216(b). Notably, the FLSA does not define "similarly situated."

Section 216(b) collective actions are intended "to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer." *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 919 (5th Cir. 2008) (quotation omitted); *see also Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ("A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same

alleged . . . activity."). Unlike class actions in which potential class members may choose to opt-out of a lawsuit, FLSA collective actions require potential class members to notify the court of their desire to opt-in to the action by filing a written consent. *See Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 435 (5th Cir. 2021). To facilitate this opt-in process, courts have the discretion to allow notice to potential plaintiffs early in litigation. *See Hoffmann–La Roche Inc.*, 493 U.S. at 171.

In *Swales*, the Fifth Circuit recently clarified the standard that district courts should use when considering whether to allow an FLSA case to proceed as a collective action. "Prior to *Swales*, courts almost always used the two-tiered approach espoused in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), to determine whether prospective opt-in plaintiffs in a proposed collective action were similarly situated enough to satisfy the FLSA." *Torres v. Chambers Protective Servs., Inc.*, No. 5:20-cv-212, 2021 WL 3419705, at *3 n.3 (N.D. Tex. Aug. 5, 2021). Step one, often described as conditional certification, "require[d] little more than substantial allegations that the putative collective members were together the victims of a single decision, policy, or plan." *Swales*, 985 F.3d at 436–37 (cleaned up). After discovery concluded, a district court made "a second and final determination, utilizing a stricter standard, about whether the named plaintiffs and opt-ins are similarly situated and may therefore proceed to trial as a collective." *Id.* at 437 (quotation omitted).

Holding that *Lusardi* and its progeny devolved into an "amorphous and ad-hoc test" that was inconsistently applied and "provide[d] little help in guiding district courts in their notice-sending authority," *Swales* eliminated the conditional certification stage. *Id.* at 440. Instead, a district court is required to follow the more stringent, second *Lusardi* step from the outset. That means that a named plaintiff bears the burden of showing that there are other "similarly situated" workers such that this case should proceed on a collective basis. *Id.* at 443 n.65. District courts are required to "rigorously scrutinize the realm of

3

'similarly situated' workers" before certifying a collective action to ensure that "the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434. That is, courts must conduct a careful, fact-intensive similarity inquiry before the issuance of notice and collective treatment. To that end, district courts must now "consider all of the available evidence"—even if that evidence is also relevant to the merits of the underlying case—to ensure that collective adjudication of the putative class members' claims will not "devolve into a cacophony of individual actions." *Id.* at 442. Put differently, district courts must ensure that proceeding as a collective action will not require "a highly individualized inquiry into each potential opt-in's circumstances," as that would detract from the FLSA's overarching goal to efficiently resolve in one proceeding issues of law and fact that are common to members of the collective action. *Id.* In deciding whether to issue notice, the district court enjoys "broad, litigation-management discretion." *Id.* at 443.

## ANALYSIS

To resolve the pending Motion to Authorize Notice, I must decide whether there is a group of employees who are similarly situated. If the answer is "yes," a collective action is appropriate, and notice should be promptly issued to potential plaintiffs. If, on the other hand, the answer is "no," McCain may proceed with an individual action, but notice should not be sent to potential plaintiffs.

In support of his argument that this case should proceed as a collective action, McCain has submitted his own declaration, various discovery responses provided by Defendants, and job descriptions prepared by Defendants for the Field Supervisor and Operator positions. Defendants counter with declarations from 13 employees, describing in great detail the job responsibilities and pay structure for both Field Supervisors and Operators.

Because the Field Supervisor and Operator positions are quite different in virtually all material respects (pay, responsibilities, etc.), I need to evaluate the jobs separately when it comes to determining whether notice is warranted.

### A. Field Supervisors

McCain contends that a collective action on behalf of Defendants' Field Supervisors is appropriate because the Field Supervisors are similarly situated with respect to job duties and pay provisions. In his declaration, McCain contends that Field Supervisors "work a significant number of hours above forty hours a week and engage in very similar work activities." Dkt. 21-1 at 2. He further notes that "Field Supervisors are compensated on a salary basis and are not paid for any overtime." *Id.*

As far as I can tell, Defendants do not dispute that Field Supervisors often work more than 40 hours a week and that they are not paid for overtime. Defendants' position is that Field Supervisors are exempt from the FLSA overtime pay requirements because they are highly compensated employees. For the majority of the time period McCain worked as a Field Supervisor, an employee was properly classified as a highly compensated employee if: (1) the employee earned total annual compensation of $100,000 or more (which must include at least $455 per week paid on a salary or fee basis)[1]; (2) the employee "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee"; and (3) the employee's primary duty includes performing office or non-manual work. *See Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020) (quoting 29 C.F.R. § 541.601).

---

[1] As noted, McCain worked as a Field Supervisor from February 2018 through April 2020. For the time period from February 2018 through December 31, 2019, the salary threshold was total annual compensation of $100,000 or more, including at least $455 per week on a salary or fee basis. Effective January 1, 2020, the salary threshold increased to total annual compensation of $107,432, with a weekly minimum of $684 per week. *See* 29 C.F.R. § 541.601.

5

It is the third element—whether the Field Supervisors' primary duty included performing office or non-manual work—that is ultimately at issue here.[2] McCain complains that the Field Supervisors have been misclassified as exempt because they engage primarily in manual labor. He states in his declaration as follows:

> Based on my experience and observations, . . . Field Supervisors . . . engaged in significant manual labor including carrying weight bars; rigging up equipment; carrying tools such as weight bars, setting tools, bond tools, and caliper tools; using these and other tools to complete manual tasks; using pipe wrenches, screw drivers, wrenches, crescent wrenches, and pliers; working in the field through the elements without an office; lifting heavy objects weighing over 100 lbs.; working with explosives and wiring explosives; and dealing with heavy overhead loads.

Dkt. 21-1 at 2.

Suffice it to say that Defendants do not agree with McCain's characterization of how much manual work is required from a Field Supervisor. According to a declaration submitted by Kevin Kennett ("Kennett"), Defendants' Vice President for Wireline Operations, Field Supervisors "are responsible for organizing and effectively leading the crew by giving clear, step by step directions, assigning responsibilities, and ensuring all [Standard Operating Procedures] and safety procedures are being followed." Dkt. 28-2 at 4. It is the Fields Supervisors' role, Kennett maintains, to "supervise the Operators who perform the manual labor in the wireline operations." *Id.* Although McCain steadfastly claims that he "was labeled a supervisor, but [in reality] was a laborer," Dkt. 28-15 at 14–15, the 13 declarations submitted by Defendants' employees paint a very different picture of the Field Supervisor position. Here is a sampling:

- "The primary duty of a Field Supervisor is non-manual work performed inside the wireline truck's mobile office. . . . [Field Supervisors] spend almost all of their time at a wellsite inside

---

[2] It is undisputed that all Operators received above the compensation threshold (element one) and performed at least one of the exempt duties or responsibilities of an exempt executive, administrative, or professional employee (element two).

6

> this office performing [various] non-manual administrative duties." Dkt. 28-2 at 6–7.

- "Field Supervisors . . . supervise the Operators who perform the manual labor in the wireline operations." Dkt. 28-3 at 2.
- "Field Supervisors I have worked for . . . are responsible for supervising the Operators and their primary job is not doing the manual labor." Dkt. 28-4 at 3.
- "I was not hired [as a Field Supervisor] to do manual labor. I was hired to supervise the Operators who do the manual labor." Dkt. 28-5 at 1.
- "The Field Supervisor's job is not [a manual labor job]. The Field Supervisors supervise the work of the Operators. The primary duty of a Field Supervisor is performed inside the wireline truck which is set up like a mobile office."[3] Dkt. 28-6 at 1.
- "The Field Supervisor job is not a manual labor job. . . . Field Supervisors generally do not get dirty when supervising the rig up." Dkt. 28-7 at 1–2.
- "It is the Operators, not the Field Supervisors, who carry weight bars, rig up equipment, use setting tools, pipe wrenches, screw drivers, crescent wrenches and pliers to complete the manual tasks." Dkt. 28-8 at 3.
- "A Field Supervisor job is not a manual labor job. . . . My primary duty as Field Supervisor is an office-type job—a mental game." Dkt. 28-10 at 1.
- "Is the primary duty of a Field Supervisor manual labor? No. . . . [Field Supervisors] rarely do any of the physical work." Dkt. 28-11 at 3–4.
- "The primary duty of a Field Supervisor is management. We used our brain more than physical labor." Dkt. 28-12 at 2.

---

[3] McCain contends that he spent roughly half of his time as a Field Supervisor working outside the mobile office. *See* Dkt. 28-15 at 28. That estimate stands in stark contrast to the time other Field Supervisors say they spent outside the mobile office. *See* Dkt. 28-10 at 2 ("I spend almost 100% of my time in the wireline truck which is set up like a mobile office."); Dkt. 28-4 at 3 ("Field Supervisors I have worked for spend 90 to 95% of their time in the wireline truck/field office."); Dkt. 28-5 at 2 ("On a 12 hour shift, I spend as much as 11 hours inside the wireline truck which is set up like a mobile office.").

Simply put, McCain's recollection of the amount of time he spent performing office or non-manual work stands in stark contrast to the amount of time other Field Supervisors recall. Given this dissimilarity, I cannot conceive how a court can adjudicate the exemption defenses collectively. *See Radford v. Pevator Cos.*, No. 17-3381, 2019 WL 7282110, at *4 (S.D. Tex. Dec. 27, 2019) ("The plaintiffs gave different accounts of the amount of time they spent on different tasks. Without a more homogenous class, there can be no collective determination on the exemption defenses [the defendant] asserts."); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008) ("[T]he dissimilarity of plaintiffs' self-reported job duties makes it exceedingly difficult for [the defendant] to assert its statutory exemption defense on a collective basis. . . . [The defendant] cannot prove a common defense to the claims of the class members by calling a handful of witnesses whose testimony strongly suggests that [the plaintiffs] are properly classified, because there are other witnesses who will testify to the contrary."). Where, as here, there are fundamental disagreements regarding the amount of manual and non-manual work performed by Field Supervisors, I cannot use representative proof to establish the applicability of the highly compensated employee exemption. Resolving the exemption issue would require an individualized factual inquiry into the amount of time each Field Supervisor spent on manual and non-manual work. This case is not appropriate for treatment as a collective action because McCain has not established that he is similarly situated to other Field Supervisors. *See Radford*, 2019 WL 7282110, at *4 *(*"Collective adjudication of exemption defenses is proper when the plaintiffs assert homogenous facts."); *Johnson*, 561 F. Supp. 2d at 587 ("One of the purposes of trying several overtime pay claims in a collective action is to avoid the inefficiencies of conducting multiple individual trials on the same factual and legal issues.").

McCain contends that the Field Supervisors are similarly situated because they all have the same job descriptions and pay provisions. To support this argument, McCain points to a written job description issued by Defendants that

8

identifies 13 "[k]ey function[s]" that Field Supervisors nationwide are expected to follow. Dkt. 21-2 at 2. "Just because a business classifies all employees in a particular job category as exempt does not mean that those employees are necessarily 'similarly situated.'" *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264 n. 46 (11th Cir. 2008). "Rather, it is necessary to review the actual job duties of those in that job category to determine whether they are similarly situated and whether the exemption defense can be collectively litigated." *Id.* The problem with McCain's argument is that the written job description he relies on says nothing about Field Supervisors conducting manual labor. Instead, the job description highlights a number of managerial duties that a Field Supervisor is expected to perform. *See* Dkt. 21-2 at 2 (stating that a Field Supervisor's tasks include, among other things, "[m]anag[ing] the well completion wireline service," "[p]lan[ning] and supervis[ing] a well test job," "[c]all[ing] and lead[ing] safety meetings," and "[d]irect[ing] preventative maintenance and repair of tools and equipment"). At its core, McCain's testimony that he performed primarily manual labor as a Field Supervisor conflicts not only with the recollections offered by other Field Supervisors, but also with the formal description of the job itself. As Defendants correctly note: "It is simply impossible for [McCain] to be similarly situated to other Field Supervisors . . . when he openly contends that he did not do the same things other Field Supervisors did." Dkt. 28 at 18. Accordingly, it would be inappropriate to allow McCain's overtime claims as a Field Supervisor to proceed on a collective basis.

**B.     Operators**

The Operator job is a manual labor job, requiring the performance of duties in the field (as opposed to an office environment). These responsibilities include servicing oil and gas wells, and maintaining and repairing service units and tools. *See* Dkt. 21-3 at 2. McCain began working for Defendants as an Operator in October 2020. As is the case with all Operators, McCain was paid hourly and received additional compensation for overtime work. McCain seeks to bring a

9

collective action on behalf of all Operators, arguing that Defendants deprived Operators of overtime pay for off-the-clock work.

At this stage, the only evidence McCain presents concerning the alleged off-the-clock work is his own declaration. He states:

> Wireline Field Operators are compensated on an hourly basis and are paid overtime. However, because of how Defendants set up clocking in/clocking out, there are hours of work that are performed off the clock. For example, individuals who travelled would sometimes be precluded from clocking in/out until arriving at a shop despite working hours before clocking in and after clocking out. Another example was Defendants required the work crews to have the same hours despite individuals working different numbers of hours. Requiring each member of a team to have the same number of hours led to certain members being shortchanged their hours because sometimes employees would have to perform additional tasks beyond the number of hours worked like having to pick up additional supplies. Another example are [sic] situations where employees were permitted to get parts and/or supplies and/or performing other work duties before clocking in. These situations led to employees not being compensated for work they performed.

Dkt. 21-1 at 2–3.

McCain is the lone voice claiming that Operators worked off-the-clock. In response to McCain's declaration, Defendants provide a stack of 13 declarations signed by both Operators and Field Supervisors. Those declarations vehemently deny that there is any corporate policy in place requiring Operators to work off-the-clock. *See, e.g.*, Dkt. 28-3 at 10 ("With respect to timekeeping by Operators, I am involved in making sure the Operators accurately report their time. They are not allowed to work off-the-clock."); Dkt. 28-6 at 3 (Operators are "not allowed to work off-the-clock"). The declarations also uniformly deny that Operators perform any off-the-clock work at all. *See, e.g.*, Dkt. 28-4 at 3 ("I have worked for 4 different Field Supervisors at [Defendants]. None of my supervisors have [sic] ever asked me to or allowed me to work off-the-clock – I always recorded my time . . . to capture all work time."); Dkt. 28-13 at 1 ("I do not do work before clocking in or

10

after clocking out."). Operators use an application on their phones to record their own time. *See* Dkt. 28-5 at 3.

Each allegation raised in McCain's declaration is specifically refuted by the declarations offered by Defendants. For example, with respect to McCain's allegation that "individuals who travelled would sometimes be precluded from clocking in/out until arriving at a shop despite working hours before clocking in and after clocking out," Dkt. 21-1 at 2, Defendants' declarations state:

- "We meet in the morning at the shop and commute together to the wellsite. Operators clock in when we meet to leave for the wellsite. They are not allowed to do work before clocking in. When we return at the end of the shift, they clock out before going home. They are not allowed to do work at the shop after clocking out." Dkt. 28-6 at 4.

- "Operators clock in when we are getting in the pickup truck to commute to the wellsite. They do not do any work before clocking in. They remain clocked in all day until we get back from the wellsite and are finished working for the day. They do not do any work after being clocked out." Dkt. 28-14 at 3.

As far as McCain's claim that "Defendants required the work crews to have the same hours despite individuals working different numbers of hours, [leading] to certain members being shortchanged their hours," Dkt. 21-1 at 2–3, the declarations provide:

- "I do not tell Operators their clock in times have to match, but they might match if we are meeting at a certain time to all drive to the wellsite together. Their clock in times would match because we are all getting into the truck at the same time." Dkt. 28-5 at 4.

- "I have never told an Operator that everyone has to clock in at the same time. Operators clock in and out on their mobile app through Paylocity. If one Operator arrives earlier than another and starts working at the shop, that Operator clocks in when he arrives and the other one clocks in when he arrives. I do not adjust their time to match." Dkt. 28-6 at 3–4.

- "My supervisor has never asked me to or allowed me to work off-the-clock – I always recorded my time . . . to capture all

11

work time. I have never been told that I have to clock in or out at exactly the same time as other Operators." Dkt. 28-13 at 2.

Finally, although McCain asserts that "sometimes employees would have to perform additional tasks beyond the number of hours worked like having to pick up additional supplies," Dkt. 21-1 at 3, the declarations describe a much different world:

- "I have never picked up parts or supplies or performed work before clocking in or after I clocked out." Dkt. 28-4 at 2; 28-13 at 2.
- "Operators do not pick up parts or supplies or perform work before clocking in or after clocking out. If I needed someone to go somewhere to pick up supplies, I make sure they are clocked in." Dkt. 28-5 at 4.
- "I have never allowed an Operator to get supplies while not clocked in. We have an Operations Manager who gets the supplies." Dkt. 28-6 at 3.

As discussed, to proceed as a collective action for unpaid overtime wages, putative class members must be "similarly situated." The ultimate inquiry turns on whether the evidence demonstrates sufficient similarity between McCain and the potential opt-ins. *See Swales*, 985 F.3d at 442. Stated differently, I need to assess "whether merits questions can be answered collectively." *Id*. Here, McCain and the other Operators are too diverse a group to be "similarly situated." Based on the evidence before me, it is clear that there is no common policy, plan, or practice concerning off-the-work time that affected all Operators. Although McCain contends that many Operators worked off-the-clock, Defendants have marshalled testimony from Operators and Field Supervisors who swear that they are unaware of any off-the-clock work being performed. McCain, in turn, offers nothing more than his own declaration. This conflict in the evidence demonstrates that individual inquiries predominate. To decide off-the-clock claims would require "a highly individualized inquiry into each potential opt-in's circumstances." *Id*. Accordingly, this case is unfit for collective treatment on behalf of all Operators.

## CONCLUSION

For the reasons stated above, I recommend that McCain's Motion to Authorize Notice (Dkt. 21) be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections under Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 6th day of January 2023.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE